**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD BLEVINS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 19 C 8075 |
| | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | Judge Joan H. Lefkow |
| TEAMSTERS, INTERNATIONAL UNION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiffs are individual members and former officers of Teamsters Local Union No. 786 who have filed this law suit against the International Brotherhood of Teamsters, International Union ("the IBT") and against Joint Council 25 of the IBT and its president, Terry Hancock, claiming violations of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 401 *et seq.* Richard Blevins, Gerald Janes, Jr., Frank Woolridge, Raul Barragan, and Eddie Rizzo, as members of Local 786, challenge a trusteeship imposed by the IBT's General President, James P. Hoffa, Jr., in the summer of 2019. They allege that the IBT sought to impose a merger of Local 786 into Teamsters Local 731 for the benefit of Local 731 and, in reprisal after Local 786's executive board rejected the merger, imposed the trusteeship. They argue that the trusteeship is unlawful as violative of the IBT's constitution, the free speech and voting rights of members under title I of LMRDA, 29 U.S.C § 411, and the trusteeship provisions of title III, 29 U.S.C. § 462.

All defendants contend that the trusteeship was imposed because Local 786's former officers (the present plaintiffs) failed to enforce collective bargaining agreements with employers

and failed to disclaim interest in representing employees of a company known as Sorrelli as ordered by Joint Council 25 after a determination that the company was in another local's jurisdiction.

Before the court are plaintiffs' motion for a preliminary injunction barring the IBT from continuing its trusteeship during the pendency of this litigation (dkt. 29) and all defendants' motions to dismiss the complaint on the basis that it fails to state a claim upon which relief can be granted. Fed. R. Civ. Pro. 12(b)(6). (Dkts. 15, 18.)

Based on the testimony of witnesses and exhibits received in evidence during the preliminary injunction hearing held July 9, 14, and 21, 2020, the affidavits and other documents submitted post hearing by agreement of the parties, the parties' respective proposed findings of fact and memoranda of law, and for the reasons set forth more fully below, the court grants plaintiffs' motion for preliminary injunctive relief (dkt. 29), denies the IBT's motion to dismiss (dkt. 15), and denies in part and grants in part Joint Council 25 and Hancock's motion to dismiss (dkt. 18).[1]

## FINDINGS OF FACT[2]

Local 786 has approximately 1,600 members and Local 731 has approximately 5,600 members. (Dkt. 70, Tr. Vol. 3 at 469:4–9.) Both locals engage in construction-related work in the greater Chicago area. (Dkt. 70, Tr. Vol. 3 at 399:10–17.) Terry Hancock is the president of Local 731 as well as the president of Joint Council 25, an intermediate Teamsters organization of

---

[1] The court has jurisdiction under 29 U.S.C. §§ 185 and 412. Venue is proper under 28 U.S.C. § 1391(b)(2) because the trusteeship was imposed in this district.

[2] The following statement of facts is based on the testimony and evidence presented at the hearing and the affidavits and other documents submitted with the parties' briefs. The court's factual findings on the motion for a preliminary injunction may be modified at trial on the merits. *Technical Pub. Co.* v. *Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984) ("A factual finding made in connection with a preliminary injunction is not binding on the court in the trial on the merits.")

which both Local 731 and Local 786 are members. (Dkt. 70, Tr. Vol. 3 at 397:1–8.) Michael Yauger was president of Local 786 during times relevant to this case. (Dkt. 68, Tr. Vol. 1 at 89:16.) Twenty-five member locals comprise Joint Council 25, including Locals 786 and 731. (Dkt. 70, Tr. Vol. 3 at 399:6.) Its geographic jurisdiction is the State of Illinois and northwest Indiana. (Dkt. 70, Tr. Vol. 3 at 399:9.)

## I. The Proposed Merger

A principal dispute of fact is whether the IBT imposed a trusteeship on Local 786 in reprisal for the vote of the executive board of the local on February 28, 2019 against a proposed merger. The testimony of the witnesses is summarized as follows:

**Michael Yauger** (via affidavit)[3]:

Hancock has long wanted to bring Local 786 under his control through a merger so as to eliminate Local 786 as a competitor that provides higher wages and benefits than his own local does.[4] (Pl. Ex. 10 at 2.) Hancock often spoke of his influence with Hoffa and has repeatedly pressed Yauger to agree to a merger. (*Id*.) Most recently, Hancock approached Yauger at an IBT conference in December 2018 and "made an offer to pay [him] $200,000 a year for three years if [he] would make the merger happen." (*Id*. at 2–3.) Yauger responded that only Local 786's executive board had the authority to approve a merger.[5] (*Id*. at 3.)

---

[3] Mr. Yauger is now retired. He was not called as a witness due to illness.

[4] Mark Hermann, while Central Region director of the construction division of IBT, stated that, as far back as 2004 or 2005, he was present when Hancock tried to convince Yauger to merge, that he was not surprised because it was well-known that Hancock wanted the merger and that Hancock offered Yauger a sum of money in exchange for cooperating with the merger. (Pl. Ex. 12.)

[5] Yauger opposed Hancock's election as president of Joint Council 25. (Pl. Ex. 10 at 2) Hancock first assumed the presidency after serving as vice-president of Joint Council 25 at the time when its president John Coli was federally indicted on fraud and embezzlement charges. (*Id*.) Yauger avers that Joint Council 25 currently is under investigation by a federal grand jury "because of influence peddling and the hiring of [now-indicted] State Senator Tom Cullerton." (*Id*.) *See United States* v. *Cullerton*, No. 19 CR 623 (N.D. Ill.); *United States* v. *Coli*, No. 17 CR 470 (N.D. Ill.).

Yauger was opposed to a merger, but he understood Hoffa's appointment of a personal representative in October 2017 (as set out below) to be a sign that the IBT might put Local 786 into trusteeship and, in order to forestall that prospect, he participated in discussions about a potential merger with Hancock and other representatives of Joint Council 25 and the IBT. (*Id*. at 3–4.)

In the first week of February 2019, Local 786's general counsel Anthony Pinelli and Yauger were on a phone call with Hancock, Joint Council 25's counsel Stuart Davidson, and Ed Keyser, the independent disciplinary officer for Hoffa, to discuss the merger. (*Id*. at 4.) Yauger understood that Keyser was Hoffa's delegate to oversee trusteeships. (*Id*. at 4.) In this phone call, "Keyser said that Local 786 would have to agree to a merger or the Local 786 would be in trusteeship 'by May l.'" (*Id*. at 4.) Thereafter, Attorney Davidson sent a draft merger agreement to Pinelli to review and sign. (*Id*. at 4.) Pinelli asked for additional information, which he did not receive, and by late February Local 786's executive board had not yet voted. (*Id*. at 4.)

During the last week of February, Pinelli and Yauger had another phone call with Keyser and Hancock. (*Id*. at 4.) Yauger asked Hancock what would happen if the Local Executive Board rejected the merger. (*Id*. at 4.) Keyser responded, "Then you will be trusteed the next day." (*Id*. at 5.)

**Terrence (Terry) Hancock**

Terry Hancock[6] concedes that Local 786 has a competitive advantage over Local 731 because Local 786 is able to allocate more of its money to wages than to the pension fund because its pension fund is fully funded, whereas Local 731 has had to shore up its underfunded

---

[6] According to Local 731's website, http://www.teamsters731.org/staff/terrence-j-hancock/ (last visited Oct. 2, 2020), Hancock was appointed in July 2017 to serve "the unexpired term of the Office of President of Teamsters Joint Council No. 25." In November 2019, he was elected president of Joint Council 25.

pension fund, diminishing wages. (Dkt. 70, Tr. Vol. 3 at 446:2–21.) Although there are four

other construction locals, and Local 786 is not in his view a construction local, Hancock only

pursued a merger with 786. (Dkt. 70, Tr. Vol. 3 at 447.)

Hancock had only one discussion with Yauger about a merger before 2018, in 2005 at a

hotel in Washington, D.C., when Yauger raised the issue.[7] (Dkt. 70, Tr. Vol. 3 at 401.) The next

occasion was in November of 2018 at an informal meeting with Yauger, and Stuart Davidson

(Joint Council 25's attorney), in which Davidson raised the issue as a means to end the "constant

in-fighting" as well as other reasons. (Dkt. 70, Tr. Vol. 3 at 421.) Hancock testified that Yauger

stated he did not have a succession plan in place, and he agreed to the terms of a merger and

would endorse the proposal discussed to his board. (Dkt. 70, Tr. Vol. 3 at 426:19-21.)

On January 21, 2019, the principal officers of Local 786 and 731, Yauger and Hancock,

met with Davidson, to discuss the terms of a possible merger of Local 786 into Local 731. (Dkt.

70, Tr. Vol. 3 at 422:15–25.) The attorneys for Joint Council 25 and Local 731 developed a draft

of the merger agreement which was given to Local 786 to review and approve. (Dkt. 70, Tr. Vol.

3 at 426:17–25.)

In the January 2019 meeting, Yauger expressed interest in a merger but wanted all his

employees to have jobs. (Dkt. 70, Tr. Vol. 3 at 424:16–425:22.) Yauger proposed a $200,000

salary for himself, and Hancock conceded that he agreed to make Yauger his assistant at that

salary, although he has never had an assistant, this agreement was never written, and he and

Yauger have had long-running disputes. (Dkt. 70, Tr. Vol. 3 at 425:2, 444:16–18.) Hancock is a

friend of Hoffa's and "good friends for more than two decades" of Keyser's (dkt. 70, Tr. Vol 3.

at 453:18), but Hancock never spoke with Hoffa or Keyser about the anticipated trusteeship

---

[7] On cross-examination, Hancock admitted that he had initiated the merger talks in 2004 or 2005.
(Dkt. 70, Tr. Vol. 3 at 453:6.)

5

before it happened. (Dkt. 70, Tr. Vol. 3 at 454:18–25.) Hancock denied that Keyser had said the local would be trusteed the next day if it did not agree to the merger. (Dkt. 70, Tr. Vol. 3 at 433:21–434:2.)

**Jeffrey Hoff**

Jeffrey Hoff is the administrator of Local 786's pension and welfare funds. (Dkt. 68, Tr. Vol. 1 at 35:7.) In the course of merger negotiations in early 2019, Pinelli asked Hoff to create a benefits comparison of Local 786 to Local 731. (Dkt. 68, Tr. Vol. 1 at 70:6–8.) Hoff concluded that "the participants of the 786 health and welfare fund would suffer because we have significant reserves, and they would be used to prop up the benefits of the 731 funds…. " (Dkt. 68, Tr. Vol. 1 at 107:18–21.)

Hoff was in Yauger's office in February 2019 in discussion with Pinelli and Yauger about the proposed merger. (Dkt. 68, Tr. Vol. 1 at 72:16–17.) Keyser called Yauger on the telephone. (Dkt. 68, Tr. Vol. 1 at 73:2–3.) Because Yauger had put the call on speakerphone, Hoff heard Keyser, who appeared to be angry, demand to know when the executive board would vote. (Dkt. 68, Tr. Vol. 1 at 75:24–76:1.) Pinelli told him the vote would be February 28, and Keyser said he'd "better sell it" to the executive board. (Dkt. 68, Tr. Vol. 1 at 75:21.) Yauger asked, "What happens if it's voted down?" Keyser responded, "You'll be trusteed the next day." (Dkt. 68, Tr. Vol. 1 at 75:23–24.)

**Richard Blevins**

Richard Blevins was, during the relevant time frame, recording secretary of Local 786. (Dkt. 69, Tr. Vol. 2 at 198:10.) He was present at a membership meeting in October 2019 that Tom Conelias, an IBT independent disciplinary officer, attended. (Dkt. 69, Tr. Vol. 2 at 202:19–25.) Blevins stated that Conelias was there to explain why a lawsuit had been filed against the

local's benefit funds. ((Dkt. 69, Tr. Vol. 2 at 203:1–6); *see Teamsters Local Union No. 786* v. *Blevins*, No. 19 C 6317 (N.D. Ill.)). "He stated that there had been a[n] agreement between Terry Hancock, Mick Yauger, and James Hoffa to merge the locals and that after the executive board of Local 786 had rejected that merger, Mike Yauger had reneged on that offer, and that's why the trusteeship was in place." (Dkt. 69, Tr. Vol. 2 at 203:12–16.) One of the main concerns of the membership was whether the pension and welfare funds were going to be merged with local 731. (Dkt. 68, Tr. Vol. 1 at 263:16.)

## II.     Proceedings Against Local 786

In 2015, five Teamsters locals, including Local 731, filed a complaint with Joint Council 25 alleging that Local 786 was infringing on the jurisdictions of other locals and had entered into collective bargaining agreements with owner-operators of trucking businesses that were "substandard" according to Joint Council 25's rules. (Dkt. 59-1, Defs. Joint Ex. 6 at JC25 02696–99). Local 786 has jurisdiction over building products delivered to construction sites but not road construction or heavy/highway work. (*Id.*) There appears to have been some overlap in these jurisdictions, which the complaining parties wanted resolved. (*Id.*)

The allegations related to Local 786's Recycled and Recyclable Building Materials and Green Products Agreement ("RRG Agreement"), effective March 1, 2015, which had been submitted to Joint Council 25 in 2013 for approval but never approved or disapproved. (Dkt. 68, Tr. Vol. 1 at 41:5–16.) Nevertheless, the local began signing members to that contract and, according to Hoff, submitted those agreements to Joint Council as required. (Dkt. 68, Tr. Vol. 1 at 40:21–41:16.) Hancock contended that the RRG Agreement contained a caveat that did not require employers to make contributions to the health and welfare pension fund if the employee did not work 90 consecutive days, among other requirements. (Dkt. 70, Tr. Vol. 3, 408:13–18.)

Because the construction season was short, Hancock said, the RRG Agreement essentially allowed the owner-operators to work without paying contributions to the welfare and pension funds. (Dkt. 68, Tr. Vol. 1 at 165:2–11.)

In April 2016, Joint Council 25 resolved the dispute in favor of the complaining locals. (Dkt. 59-1, Defs. Joint Ex. 9.) Local 786 appealed, but on January 23, 2017 the IBT General Executive Board (GEB) issued a decision upholding Joint Council 25's determination and directing Local 786 to revise the RRG Agreement to meet area standards or, if that was not possible, to cancel it. (*Id.*) The GEB also ordered Local 786 to refrain from entering into "substandard" agreements and to take all appropriate steps to enforce all provisions of the RRG Agreement with respect to owner-operators. (*Id.*)[8]

On July 17, 2017, Hoffa appointed Marion Davis as his personal representative for the purpose of "resolving outstanding issues concerning Local 786's compliance with the [2017 GEB Decision]." (Dkt. 59-2, Defs. Joint Ex. 18 at IBT 000923–24.)

Local 786 has no financial difficulties. (Pl. Ex. 10 at 2.) Indeed, according to Hoff, Local 786's benefit plans are fully funded.[9] (Dkt. 68, Tr. Vol. 1 at 35:12–15.) Local 731's plans are funded below their actuarially-expected obligations.[10] (Pl. Ex. 10 at 2; dkt. 70, Tr. Vol. 3 at

---

[8] The charging locals argued that Local 786 was undermining area standards by using the RRG Agreement to cover road construction work already covered by the association agreements. (Dkt. 59-1, Defs. Joint Ex. at JC25 0031.

[9] Hoff testified, "The largest fund is 100 percent funded. The health and welfare fund has 28 months of reserves. The lumber fund is … mid 90 percent funded, and the severance is a defined contribution." (Dkt. 68, Tr. Vol. 1 at 35:12–15).

[10] Hoff testified that as part of his duties he compares Local 786's benefits with other locals in the Greater Chicago area, including Local 731's, and has found that 786's "benefits are superior for both health and welfare and the pension fund." (Dkt. 68, Tr. Vol. 1 at 37:8-12.) He also testified that he recommended against a merger because of 731's significantly inferior benefits. (*See id*. at 107:7–8). Hancock asserted that the funding ratio was 87.29% and was healthy. (Dkt. 77-2, Defs. Joint Ex. 43 at JC25 001848–49.) Although neither side has properly offered evidence of the relative stability of the two

8

446:18–21.) Wages and benefits are more attractive at Local 786 than 731. (Dkt. 70, Tr. Vol. 3 at 446:2–447:5.) Defendants do not dispute this.

From February through June 2017, Local 786 submitted drafts of a replacement for the RRG Agreement to Joint Council 25 for review. (Dkt. 59-2, Defs. Joint Ex. 12 at IBT 000925–32.) In June, the Executive Board of Joint Council 25 approved a Non-Association Construction Agreement ("NACA") (Dkt. 74 ¶ 5.). (Dkt. 59-2, Defs. Joint Ex. 13 at IBT 001449–76; Defs. Joint Ex. 14 at IBT 000919–20.)

Sections 8.2(j) and 9.2(d) of NACA provided that the employers and owner-operators agreed to be bound by the trust agreements that created the health, welfare and pension funds. (Dkt. 59-2, Defs. Joint Ex. 13 at IBT 001461, 001463.) A separate addendum, No. 3, to this agreement for the independent owner-operators required them to sign the participation agreements and to contribute to the health, welfare and pension funds. (*Id*. at 001472.)

NACA went up the union chain of command, and on August 8, 2017, General President Hoffa approved it as compliant with the 2017 GEB Decision. (Dkt. 59-2, Defs. Joint Ex. 17 at IBT 000921–22.)

On October 6, 2017, Hoffa appointed Patrick Gleason as his personal representative for Local 786, replacing Davis. (Dkt. 59-2, Defs. Joint Ex. 20 at IBT 000412.)

On October 26, 2017, Gleason submitted a report to Hoffa in which he concluded that, "while Local 786 did not meet the compliance date of July 18, 2017, Local 786 is now in compliance with the recommendations of the [GEB]." (Dkt. 59-3, Defs. Joint Ex. 21 at IBT 001488–90.) The letter noted that Local 786 had given appropriate notice of the cancellation of

---

locals' benefit funds, for the purpose of this motion, the court gives greater weight to plaintiffs' evidence. Hancock admitted at the evidentiary hearing that "until recently, the pension fund in Local 731 . . . according to the PBGC … was determined to be underfunded." (Dkt. 70, Tr. Vol. 3 at 448:14–17.)

the RRG Agreement to 385 eligible members/employers and 31 had signed NACA, adding, "Benefits participation compliance has been reviewed and confirmed." (*Id*. at IBT 001490.)

In a letter dated May 23, 2018, the Local 786 Executive Board sent copies of NACA, along with two benefit participation agreements, to 140 owner-operators who were Local 786 dues-paying members. (Dkt. 59-3, Defs. Joint Ex. 26 at IBT 001491–96.) In this letter, Local 786 officers also advised the members that they were required to sign these participation agreements pursuant to the 2017 GEB Decision. (*Id.*)

On August 27, 2018, the Local 786's executive board sent a second letter to approximately 135 of these same Local 786 members advising them that, as of the date of the letter, they had failed to return a signed copy of the participation agreements and notified the members that failure to sign and return the participation agreements would result in a disclaimer from Local 786. (Dkt. 59-3, Defs. Joint Ex. 28 at IBT 001497–1503.)

On October 4, 2018, Blevins, then recording secretary of Local 786, sent a letter to 126 members to inform them that they had been disclaimed from Local 786 as of October 1, 2018 for failure to return signed participation agreements for the health and welfare and pension funds. (Dkt. 59-3, Defs. Joint Ex. 29 at IBT 001504–07.)

According to Hoff, ultimately few of those who had signed the RRG ended up signing the NACA participation agreements. (Dkt. 68, Tr. Vol. 1 at 135:1–4.) Hoff inferred from conversations he had had with members that few signed the participation agreements because most could not afford to pay into the welfare funds. (Dkt. 68, Tr. Vol. 1 at 165:24–25.)

On October 5, 2018, Hoffa reappointed Gleason to serve as his personal representative to monitor Local 786's finances and the administration of its collective bargaining agreements. (Dkt. 59-3, Defs. Joint Ex. 23 at 222–23.)

On January 11, 2019, Gleason submitted a report to the General President on Local 786's enforcement of NACA. (Dkt. 59-3, Defs. Joint Ex. 30 at IBT 005452–5500.) The report stated that Local 786 had disclaimed 126 members effective October 1, 2018 for failure to return participation agreements but had not enforced "the requirements of NACA," resulting in a loss of income to the various funds exceeding $1.1 million. (*Id.*)[11]

Gleason's report also faulted Local 786 for failing to disclaim interest in representing the employees of Sorrelli/International Hauling and Excavating after the Joint Council awarded jurisdiction to Local 731. (*Id.*) Significantly, he reported, Local 786 had not petitioned the National Labor Relations Board to withdraw its certification to represent Sorrelli employees. (*Id.*) This prevented any other local from recruiting Sorrelli employees and prevented those employees from joining any other local. (*Id.*)[12]

On March 7, 2019, Hoffa provided Gleason with "additional authority" over Local 786 to review and approve applications for membership and collective bargaining agreements. (Dkt. 59-4, Defs. Joint Ex. 32 at IBT 000224–25.)

On March 13, 2019, Hoffa sent Local 786 a letter notifying the membership of a trusteeship hearing. The letter set forth allegations of mismanagement he said potentially

---

[11] The court infers that Gleason's calculations are based on the contributions that would have been due from the 126 members had they signed the participation agreements and worked. Gleason testified at the evidentiary hearing that Local 786 advised him that it was not cost effective to pursue the owner-operators and determine whether the contributions to the funds were due. (Dkt. 69, Tr. Vol. 2 at 305:20–21.) According to plaintiffs, these members were not working in Cook County where Hancock's "task force would not allow those owner-operators to work in their area anywhere." (Dkt. 68, Tr. Vol. 1 at 138:7–10.) Several 786 members testified (although not under oath) during the trusteeship hearing that they were not allowed to work. *E.g.*,"673 shut me down on a few jobs." (Witness Dano, 57-1 at 141); "We have proven to [Local 179] that we are paying our driver's properly. We have proven to them that we have paid our Health Welfare and Pension Fund to 786 and we are paying area standards. They call us non-union scumbags." (Witness Boban, *id.* at 143). The most the court can conclude from the evidence is that there was serious internecine conflict between the two locals.

[12] Plaintiffs contend that, because Local 786 never entered into a collective bargaining agreement with Sorrelli, there was no contract to disclaim.

warranted placing it under trusteeship. (Dkt. 59-1, Defs. Joint Ex. 3 at IBT 000226–29.) He wrote that, while the IBT had approved NACA as meeting area standards, "it has been alleged that Local 786 failed to enforce the provisions of the agreement by not requiring signatory owner-operators to pay the contractually required contributions to Local 786's Health & Welfare and Pension Funds, as well as the Joint Council No. 25 Training Fund." (*Id.* at IBT 000228.) He also wrote that it had been alleged that Local 786 had failed to comply with Joint Council 25's directive that it should disclaim interest in representing employees at Sorrelli out of deference to another local's organizing efforts there. (*Id.* at IBT 000228–9.)

On April 13, 2019, the IBT held a trusteeship hearing at 300 South Ashland, Suite 300, Chicago, Illinois before three hearing officers. (Dkt 59-1, Defs. Joint Ex. 5 at IBT 000230–41.) Pinelli represented Local 786. The panel heard testimony from seven witnesses and statements from six Local 786 members. (*Id.*) Numerous documents were presented by both sides and members were allowed to speak. (*Id.*) Local 786 presented a petition opposing a trusteeship, which was signed by 871 of its members. (*Id.* at IBT 000230.)

On July 22, 2019, Hoffa wrote to Local 786 that he was accepting the recommendation of the hearing panel recommending that IBT place Local 786 under trusteeship. (Dkt. 59-1, Defs. Joint Ex. 4 at IBT 000248–51.) Hoffa wrote that the evidence presented at the hearing generally bore out all of the allegations described in his March 13, 2019 letter. (*Id.*) He appointed Dennis Morgan as Local 786's temporary trustee. (*Id.*)

The IBT constitution, as relevant here, provides:

If the General President has or receives information which leads him to believe that any of the officers of a Local Union or other subordinate body are dishonest or incompetent, or that such organization is not being conducted in accordance with the Constitution and laws of the International Union or for the benefit of the membership, or is being conducted in such a manner as to jeopardize the interests of the International Union or its subordinate bodies, or if the General President

believes that such action is necessary for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures or preventing any action which is disruptive of, or interferes with the performance of obligations of other members or Local Unions under collective bargaining agreements, or otherwise carrying out legitimate objects of the subordinate body, he may appoint a temporary Trustee to take charge and control of the affairs of such Local Union or other subordinate body; provided, however, that before the appointment of such temporary Trustee, the General President shall set a time and place for a hearing for the purpose of determining whether such temporary Trustee shall be appointed…

(Dkt. 59-1, Defs. Joint Ex. 2 at IBT 000046–47.)

## ANALYSIS

### I.    Preliminary Injunction

The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. *See Girl Scouts of Manitou Council, Inc.* v. *Girl Scouts of USA, Inc.,* 549 F.3d 1079, 1085–86 (7th Cir. 2008). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell* v. *CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the movant makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e.* the public interest. *Id.* at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. *Foodcomm Int'l* v. *Barry*, 328 F.3d 300, 303 (7th Cir. 2003). The

greater the movant's likelihood of success, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Id.*

### A. Likelihood of Success on the Merits

To succeed in their attempt to preliminarily enjoin IBT from imposing the trusteeship, plaintiffs must show that they have a "better than negligible" chance of success on the merits of at least one of their claims. *Ty, Inc.* v. *Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001); *Omega Satellite Prods. Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982). This is an admittedly low requirement and is simply a threshold question. *Roland Machinery Co.* v. *Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984).

### 1. Violation of the Trusteeship Provisions Under Title III (Count I)

Section 462 of the LMRDA provides that a trusteeship may be established "only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization." 29 U.S.C. § 462; *Allied Indus. Workers of Am.* v. *Local Union No. 589*, 693 F.2d 666, 675 (7th Cir. 1982). Section 464 of the LMRDA provides that a trusteeship "established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing" is presumptively valid for eighteen months, and can only be dissolved "upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462.…" 29 U.S.C. § 464(c).

The parties dispute when the trusteeship should be deemed to have started. The plaintiffs argue that it began on March 7, 2019, when Hoffa expanded Gleason's authority, allegedly curtailing Local 786's autonomy. The plaintiffs thus argue that the eighteen-month presumption of validity expired on September 7, 2020. The defendants argue that the trusteeship began when the IBT formally voted to impose the trusteeship on July 22, 2019, in which case the presumption of validity will not expire until January 22, 2021. Defendants note Hoffa expressly said in his March 7, 2019 letter that he was not imposing a trusteeship. (Dkt. 25-1 at 2.)[13]

In either event, plaintiffs argue the trusteeship should not be entitled to a presumption of validity and should be dissolved because it was not imposed in conformity with the IBT constitution or after a fair hearing. They further argue the trusteeship should be dissolved because it was imposed in bad faith, for an anti-democratic purpose, in retaliation for Local 786 members' exercise of civil rights protected by Title I of the LMRDA, and because it is not being maintained in good faith due to the appointed trustee's neglect.

The court accepts defendants' position that the trusteeship is still presumed valid, as plaintiffs have shown no authority for its position that a personal representative can establish a *de facto* trusteeship. A trusteeship imposed in contravention of a union's constitution and bylaws or without a fair hearing, however, is not entitled to a presumption of validity. 29 U.S.C. § 464(c); *United Bhd. of Carpenters & Joiners of Am.* v. *Brown*, 343 F.2d 872, 883-84 (10th Cir. 1965) ("Congress intended the presumption of validity to be available only where the trusteeship has been established in conformity with the procedural requirements of [the parent union's]

---

[13] The significance of the date is that, "[a]fter the expiration of eighteen months the trusteeship shall be presumed invalid in any such [preliminary injunction] proceeding and its discontinuance shall be decreed unless the labor organization shall show by clear and convincing proof that the continuation of the trusteeship is necessary for a purpose allowable under section 462 of this title. In the latter event the court may dismiss the complaint or retain jurisdiction of the cause on such conditions and for such period as it deems appropriate." 29 U.S.C. § 464(c).

constitutions and bylaws and authorized or ratified after a fair hearing"); *Laborers' Int'l Union of N. Am.* v. *Nat'l Post Office Mail Handlers, Watchmen, Messengers & Grp. Leaders Div. of the Laborers' Int'l Union of N. Am.*, 880 F.2d 1388, 1395 (D.C. Cir. 1989) (same).

The only applicable statutory basis for the trusteeship asserted by defendants is "non-performance of collective bargaining agreements" with respect to collection of benefit contributions from owner-operators. The evidence of this is minimal. Although Gleason had been responsible for Local 786's financial affairs well more than a year by the time of the evidentiary hearing, defendants did not identify any delinquent contributions by any owner-operator required to make them. The fact that Local 786 is financially sound—more sound than other locals in this area, belies the accusation as well. As such, the court is persuaded that plaintiffs' have a likelihood of success on this issue.

### 2. Fair Hearing Under 29 U.S.C. § 464(c)

Plaintiffs next argue the trusteeship hearing was unfair because no evidence in support of the charges was presented and because the IBT has not disclosed the report of the hearing panel upon which Hoffa based his decision. (Dkt. 21 at 14.) With respect to the hearing panel's report, defendants argue that the IBT constitution does not require that the report either be made in writing or disclosed to the trusteed local. (*Id.*)

The Fifth Circuit has held that section 464's fair hearing requirement "implies at least the procedural requirements of notice of the charges and the date and nature of the hearing, presentation of evidence and witnesses in support of the reasons for imposing the trusteeship with the opportunity for cross-examination, and the opportunity to present evidence in rebuttal." *Jolly* v. *Gorman*, 428 F.2d 960, 967–68 (5th Cir. 1970). Accordingly, a hearing cannot be fair where it does not involve the presentation of relevant evidence. *Plentty*, 302 F. Supp. at 339

(granting preliminary injunction dissolving trusteeship where "no evidence was presented by the International or the trustees to justify the imposition of the trusteeship); *Jolly*, 428 F.2d at 968 (stating that initial hearing at which "there apparently was no attempt. . . to present evidence or to make specific findings" was unfair but that fair hearing requirement was met based on subsequent hearing). Here, however, the transcript of the hearing is in the record (dkt. 57-1A) and it reflects that the process set out in *Jolly* was provided.

With respect to the hearing panel's report and recommendation, the IBT's constitution states that the hearing panel may make their recommendation to the general president "orally or in writing," and there is no requirement that those recommendations be published to the local or to the membership. (Dkt. 16-6 at 11.) The IBT Constitution is a contract between the IBT and Local 786 and should be enforced as such. *See generally Int'l Bhd. of Boilermakers* v. *Local Lodge 714*, 845 F.2d 687, 691 (7th Cir. 1988) ("Within the limits fixed by the statute the union can exercise whatever powers of imposing trusteeships it enjoys by virtue of its contractual relationship with its affiliates"). Plaintiffs do not cite any provision of the constitution that entitles them access to a written report. (Dkt. 21 at 14.) The court thus concludes they have no such entitlement.

### 3. Whether the Trusteeship Was Imposed in Good Faith

Plaintiffs argue that even if the presumption of validity applies, there is clear and convincing evidence that the IBT's stated reasons for imposing the trusteeship—that Local 786 was undercutting area standards, failing to collect required fringe benefit contributions, and interfering with another local's organizing campaign—are false and pretextual. (Dkt. 25 at 7.) Plaintiffs contend that the true motivation for the trusteeship was Hancock's desire to merge Local 786 with Local 731 and, in particular, to "merge the fully funded benefit plans of Local

786 into the underfunded Local 731 plan and silence [Local 786] as a voice of opposition to corrupt activities in the Joint Council. . ." (Dkt. 21 at 4.) Defendants respond that as a matter of law, the IBT only needs to show one permissible reason for imposing the trusteeship, even if that reason was not one previously charged or addressed at the trusteeship hearing. (Dkt. 16 at 12.) Defendants also maintain that as a factual matter the IBT's stated reasons for imposing the trusteeship were true and valid reasons. (Dkt. 16 at 9.)

The Seventh Circuit has held that trusteeships must be imposed both for a statutorily authorized purpose *and* in good faith, stating that "the requirement of 'good faith' obtains regardless of the 'purpose' for which a trusteeship is created." *Allied Industrial Workers* v. *Local 589,* 693 F.2d 666, 676 (7th Cir. 1982); *see also Mason Tenders Dist. Council* v. *Laborers' Int'l Union of N. Am.*, 884 F. Supp. 823, 833 (S.D.N.Y. 1995) (same). That holding follows from the plain language of Section 464, which provides that a trusteeship may be dissolved within its first eighteen months upon a showing of "clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462." 29 U.S.C. § 464(c).

Defendants nevertheless argue that good faith is not an independent requirement under the statute; thus, a pretextual reason is permissible except where the true purpose is "self-interested, not in the union's best interest, or outrageous or unconscionable." (Dkt. 23 at 5.) They cite several cases upholding a trusteeship where it is supported by one valid purpose, but none of them suggests that dishonesty is consistent with good faith. *See Satink* v. *Hoffa,* No. 04 C 2019, 2005 WL 2007250, at *24 (N.D. Ohio Aug. 22, 2005); *Mason Tenders,* 884 F. Supp. at 836; *SEIU Local 87* v. *SEIU Local 1877,* 230 F. Supp. 2d 1099, 1105 (N.D. Cal. 2002). The notion that a parent union could impose a trusteeship for pretextual reasons would read the fair hearing

18

requirement out of the LMRDA when, as described above, it is a necessary prerequisite to a valid trusteeship.[14] *Plentty*, 302 F. Supp. at 339. The court thus holds that good faith under the LMRDA requires that a trusteeship be supported by honest reasons.

Hoffa's July 22, 2019, letter to Local 786 sets forth three reasons for the trusteeship: (1) that the RRG Agreement was allegedly substandard and its successor agreement, the NACA, was not followed, (2) that the union was permitting owner-operators to avoid paying for required fringe benefits, and (3) that Local 786 had defied Joint Council 25's directive intended to prohibit it from interfering with Local 179's organizing campaign at Sorrelli.[15] (Dkt. 16-5.)

Plainly, the first allegation is unfounded, as Local 786 complied with IBT's directive by substituting NACA, which IBT approved long before the trusteeship was imposed. The second allegation is not supported by any specific evidence despite the presence of Gleason, who was given responsibility for the affairs of the union months before the trusteeship was imposed. Also, once the trusteeship was imposed, the trustee did not go after any owner-operators for contributions, which indicates that either the problem did not exist or was not considered worthy of pursuing. Furthermore, the fact that collective bargaining agreements of Local 786 currently exceed area standards, for both wages and benefits, and wages and benefits are more generous than its competitor locals also undermines this accusation. (Dkt. 25 at 4.)

With respect to the Sorrelli organizing campaign, plaintiffs contend that this was "an ordinary jurisdictional dispute that Teamster locals routinely have." (Dkt. 25 at 8.) And because Local 786 never entered into a collective bargaining agreement with Sorrelli, there was no

---

[14] Gleason specifically testified at the trusteeship hearing that the trusteeship was not about the merger. (Dkt. 57-1A at IBT 000296.)

[15] All three issues also were discussed in Hoffa's March 13, 2019 letter setting forth charges to be heard at a trusteeship hearing. (Dkt. 16-3.)

19

interest to disclaim. They disregard the part about withdrawing the local's certification with the NLRB. That Local 786 did not petition for withdrawal with the NLRB was a valid reason for a trusteeship alone is highly doubtful because Gleason was in charge but did not do it and there is no evidence of any specific directive from IBT to do it. (Presumably any local that wanted to organize at Sorrelli could also have petitioned the NLRB to decertify Local 786.) For the purposes of this decision, the court finds that plaintiffs' likelihood of success is better than negligible.

### 4. Evidence that the Trusteeship was Imposed in Retaliation for Local 786's Rejecting the Merger

The court finds, based on preponderance of the evidence, the following:

Yauger and Hancock had long-standing disagreements, so it is unlikely that Yauger would have been willing to merge with Hancock's local, particularly where his membership was strongly opposed to it.

Hancock, on the other hand, had financial and competitive reasons to seek a merger. Once he became president of Joint Council 25 in July 2017, he was in a position to push for a merger. He had strong and long-standing relationships with Hoffa and Keyser. Local 786 was in a better financial situation and more competitive in attracting members and employers than Local 731. Under the IBT's constitution a local has the authority to reject a merger, which meant that Hancock had little recourse to accomplish the merger legitimately.[16]

That Hoffa within a couple of weeks after the vote expanded Gleason's responsibility for Local 786's affairs, strongly suggests that Hoffa and Keyser were part of an agreement with

---

[16] Section 11 of Article IX of the IBT Constitution provides that, "All mergers of subordinate bodies shall be subject to approval by the General Executive Board, and no such merger shall be effectuated until such approval has been obtained." (Dkt. 57-1A at IBT 000105.)

Hancock to force a merger on Local 786. It is more likely than not that Hancock offered Yauger $200,000 a year for three years if he would agree to a merger.[17]

Therefore, the court concludes that plaintiffs have a substantial likelihood of success on the merits of its claim that the trusteeship was imposed in retaliation for rejecting the merger.

### 5. Whether an Anti-Democratic Purpose Is an Independent Ground for Dissolution

Plaintiffs claim that "the Seventh Circuit has also held it is illegal to impose a trusteeship for an anti-democratic purpose," independent of the grounds for overturning a trusteeship set forth in 29 U.S.C. § 464(c), citing *Local Lodge 714,* 845 F.2d at 693. (Dkt. 21 at 10; dkt. 25 at 1.) But *Local Lodge 714* does not come close to such a holding. True, the opinion states that the stated purpose of the LMRDA is to promote democratic control of unions. *Id.* (citing 29 U.S.C. § 401). But that is about as much as can be said for plaintiffs' interpretation. That case involved a trusteeship imposed upon a local that had attempted to disaffiliate from the international boilermakers union and join a competitor. The Seventh Circuit vacated an injunction enforcing the trusteeship and remanded for a determination of whether the local had so few members by virtue of its disaffiliation that it should be deemed to have disbanded under the international's constitution. *Id.* at 695.

Plaintiffs argue that *Local Lodge 714* approvingly cited *Brown*, 343 F.2d at 883, and that that case supports their position. But that is also incorrect. *Brown* held that a trusteeship was invalid because it had been imposed neither for one of the purposes listed in Section 302 nor in conformity with the union's constitution and bylaws. *Id.* at 884. There is no suggestion in that

---

[17] Hancock was not credible when he stated that Yauger had asked for that salary or that he was to be Hancock's assistant. Hancock was not credible in stating that Hoffa and Keyser had not spoken with him about the proposed merger. He made admissions on cross-examination that were inconsistent with his direct. Overall, the court is not persuaded that Hancock was fully truthful in his testimony.

case that a claim that a trusteeship was imposed for an "anti-democratic purpose," whatever that term may mean, may be an independent ground for its dissolution.

### 6. Whether the Trusteeship Is Being Administered in Good Faith

Plaintiffs also argue that the trusteeship should be dissolved because there is clear and convincing evidence that it is presently not being administered in good faith. (Dkt. 25 at 13.) The Seventh Circuit has held that "§ 464(c) permits a trusteeship to be challenged on the alternative grounds that it was not established *or* maintained in good faith." *Allied Indus. Workers*, 693 F.2d at 676.

Plaintiffs claim, pointing to Blevins's declaration, that contracts are being "rolled over" without any bargaining, and the IBT's prior trustee, Dennis Morgan, had complained that Terry Hancock was not letting him perform his duties. Blevins's declaration specifically states that since May 2019, "49 of the 150 contracts to which [Local 786] is a party have expired. . . . and Morgan has neither himself bargained these contracts nor approved anyone to bargain them." (Dkt. 25-2 ¶¶ 13-14.) Blevins also avers that "Morgan has stated that Terry Hancock refused to let him approve contracts or perform his obligations as trustee." (*Id.* ¶ 15). Blevins confirmed this testimony at the evidentiary hearing. (Dkt. 68, Tr. Vol. 1 at 68:3–7.) Based on the evidence, the court finds that plaintiffs have a better than negligible likelihood of success on the merits of its claim that the trusteeship is not being maintained in good faith.

### 7. Whether Title I Impacts the Validity of the Trusteeship

Plaintiffs also argue that the court should dissolve the trusteeship because it was imposed in retaliation for Local 786 members' exercise of rights guaranteed by Title I of the LMRDA, 29 U.S.C. § 411, specifically their right to vote to reject the merger and their free speech right to be an "independent voice of opposition to Hancock." (Dkt. 21 at 13.) Plaintiffs cite *Union de*

22

*Empleados de Muelles de Puerto Rico, Inc.* v. *Int'l Longshoremen's Ass'n*, 884 F.3d 48, 65 (1st Cir. 2018), for the proposition that "[i]ndividual members of the union who wish to challenge a trusteeship imposed for purposes that violate their individual rights have a cause of action under Title I of the LMRDA."[18] But no challenge to a trusteeship predicated on a Title I violation was at issue in that case and the court was merely speaking in general terms about union members' ability to enforce their Title I rights even where trusteeships have been imposed. As is evident from the discussion above, a parent union's imposing a trusteeship in order to curtail members' Title I rights clearly would be an improper purpose under section 462, but plaintiffs cite no authority suggesting that a challenge to a trusteeship based on Title I would not have to surmount the presumptive validity and clear-and-convincing proof standards of section 464(c). *See Farrell* v. *Int'l Broth. of Teamsters,* 888 F.2d 459, 461 (6th Cir. 1989) (holding that the existence of an independent Title I challenge to the validity of a trusteeship would "reduce to surplusage those positions of Title III which provide a specific remedy for improper establishment of trusteeships"); *Morris* v. *Hoffa,* 2001 WL 1231741, at *10 (E.D. Pa. 2001), *aff'd*, 361 F.3d 177 ("Plaintiffs' argument that the imposition of the trusteeship violated their rights of free speech under the LMRDA Bill of Rights is really just another way of saying that the trusteeship was invalid because it was imposed for an improper motive."). Thus, the court concludes that plaintiffs' invocation of Title I does not change the analysis of the validity of the trusteeship.

---

[18] Plaintiffs also argue that *Sheet Metal Workers* v. *Lynn,* 488 U.S. 347 (1989) "held that members do not forego Title I rights in connection with a trusteeship." But that case merely held that the LMRDA prohibits a trustee from removing members from an elected position in retaliation for exercise of their Title I rights. *Id.* at 356. It did not hold that a violation of Title I rights may be the basis for the dissolution of a trusteeship during the eighteen-month period of presumed validity.

### B. Likelihood of Irreparable Harm

Permitting an invalid trusteeship to continue would cause irreparable harm to Local 786. *See Mason Tenders*, 884 F. Supp. at 833 (stating that irreparable harm exists where union leaders are barred from "performing those duties which they were elected to perform").

### C. Balance of the Hardships

There is little risk of harm to the IBT from granting preliminary injunctive relief. Even if the court were ultimately to determine on the merits that the trusteeship was valid, the presumption of validity will soon expire. Furthermore, the IBT has pointed to no risk of mismanagement should Local 786 be granted its autonomy again. This factor weighs in favor of preliminary injunctive relief. On Local 786's side, the trustee has not, or has not been allowed to, enter into negotiations to renew collective bargaining agreements, which has caused loss of potential agreements with employers and income and benefits for its members. Compared to plaintiffs' likelihood of success on the merits, the hardship to defendants is minimal.

### D. Public Interest

The public interest weighs in favor of dissolving a trusteeship imposed in violation of the LMRDA.

### II. MOTIONS TO DISMISS

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences therefrom in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must

24

also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

As is clear from the above analysis of the motion for preliminary injunction, the motions to dismiss are denied with the exception of claims against Joint Council 25. Plaintiffs make no allegations as to how Joint Council 25 bears responsibility for imposing the trusteeship, aside from Hancock's actions. And while Hancock is the president of Joint Council 25, the complaint alleges that Joint Council 25 is governed by seven voting members. (*Id.* ¶ 31.) Plaintiffs make no allegation as to those other voting members' involvement in the imposition of the trusteeship or any official action of the council that impaired their rights. Therefore, the claims against Joint Council 25 are dismissed without prejudice.

## INJUNCTION AND ORDER

Plaintiffs' motion for a preliminary injunction dissolving the trusteeship (dkt. 29) is granted. Pending disposition of this litigation, the IBT is hereby enjoined from continuing the trusteeship and directed to withdraw the appointment of any trustee currently in place. The plaintiffs shall be restored to the *status quo ante* the imposition of the trusteeship.

The IBT's motion to dismiss (dkt. 15) is denied. Joint Council 25 and Hancock's motion to dismiss (dkt. 18) is denied as to Hancock individually and granted as to Joint Council 25, without prejudice to repleading. The IBT, Joint Council 25, and Hancock's motion for a decision on their motion to dismiss filings prior to the preliminary injunction hearing (dkt. 30) is moot.

Date: October 6, 2020

U.S. District Judge Joan H. Lefkow